PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

TAVON BRADLEY,
*Defendant-Appellant.*

No. 02-4390

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

SOLOMON LEVI JONES, a/k/a Monkey Bird,
*Defendant-Appellant.*

No. 02-4393

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ERIC LAMONT BENNETT, a/k/a E Man,
*Defendant-Appellant.*

No. 02-4402

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CR-00-432)

Argued: May 26, 2006

Decided: July 25, 2006

Before MOTZ, GREGORY, and DUNCAN, Circuit Judges.

Vacated and remanded by published opinion. Judge Motz wrote the opinion, in which Judge Gregory and Judge Duncan joined.

**COUNSEL**

**ARGUED:** Harvey Greenberg, Towson, Maryland; Jack B. Rubin, Baltimore, Maryland, for Appellants. Andrew George Warrens Norman, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Joseph J. Gigliotti, Silver Spring, Maryland, for Appellant Eric Lamont Bennett; Gerald D. Glass, Towson, Maryland, for Appellant Tavon Bradley. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

After several extensive plea discussions with the district court, Tavon Bradley, Solomon Jones, and Eric Bennett (collectively "the Defendants") pleaded guilty to charges of conspiracy to distribute crack cocaine and of illegal use of firearms. On appeal, they argue that their guilty pleas were not voluntary because the court impermissibly participated in plea negotiations, repeatedly encouraging them to plead guilty. As the Government properly concedes, the record indisputably reflects this participation and encouragement. Because Defendants have demonstrated that this admitted plain error adversely affected their substantial rights and because we conclude that the error seriously affects the fairness, integrity, and public reputation of judicial proceedings, we must vacate the judgment of the district court and remand for further proceedings.

## I.

Bennett was the leader of a wide-ranging and violent crack cocaine distribution ring that operated in Baltimore and Westminster, Maryland; Jones and Bradley participated in that conspiracy. According to the Government, pursuant to Bennett's orders, Jones killed a participant in a sham drug transaction, and Bradley broke into an apartment and attempted to rob the occupant at gunpoint. The Government's evidence included audiotapes and videotapes of the Bennett organization's activities and the testimony of several cooperating co-conspirators.

On August 24, 2000, a grand jury indicted Bennett on conspiracy and substantive charges of distribution and possession with intent to distribute crack cocaine. Six months later, on February 21, 2001, Bennett indicated his willingness, pursuant to a written plea agreement, to plead guilty to the conspiracy count, with the Government recommending a ten-year sentence. During the Rule 11 colloquy, Bennett stated, "I'm pleading guilty to this ten years." The district court explained to Bennett that he would be pleading guilty to an offense that carried a mandatory *minimum* sentence of 10 years and a maximum sentence of life without parole. After Bennett learned that the court could impose a sentence exceeding ten years, he stated that he did not wish to plead guilty and the court terminated the colloquy.

The next month, on March 29, the grand jury returned a superseding indictment that included the following five counts: 1) conspiracy to distribute and to possess with intent to distribute fifty grams or more of crack cocaine, 2) distribution of five grams or more of crack cocaine, 3) possession of two firearms in furtherance of a drug trafficking crime, 4) possession of a firearm in furtherance of a drug trafficking crime, and 5) possession with intent to distribute a detectable amount of crack cocaine.[1] The superseding indictment charged Ben-

---

[1]On January 9, 2002, the grand jury returned a second superseding indictment; the only additions to the first superseding indictment were descriptions of the firearms involved in counts three and four. The weapons in count three were described as "one Smith and Wesson .357 magnum revolver . . ., and one Armi Fratelli Tanfoglio 9 mm semi-automatic handgun." The weapon in count four was described as "one SWD Cobray 9 millimeter pistol."

nett with all five counts, Bradley with counts one and four, and Jones with counts one and three. Bradley and Jones were arraigned in May 2001, and both entered pleas of not guilty. In addition to these federal charges, Bradley and Jones also faced related charges in state court: Bradley on conspiracy and robbery charges, and Jones on murder charges.

During a pre-trial conference on November 26, 2001, Jones's counsel stated that Jones wanted to plead guilty and that counsel had been working with federal officials and Jones's state counsel to coordinate a disposition covering both the federal and state charges. The Government responded that negotiations for a plea agreement with Jones were continuing. However, no plea materialized.

On January 28, 2002, the district court empaneled a jury and began the trial. The next day, January 29, Oscar Bennett, a cooperating co-conspirator and Eric Bennett's cousin, testified at length about the scope and activities of the conspiracy. Before the jury entered the courtroom on the following morning, January 30, the court dismissed counsel for the Government and addressed the Defendants and their counsel directly. The court stated, "I know that each of you probably ha[s] some experience in the state system. But I am just taking this opportunity, now that you have sat through a full day of testimony of one government witness, I just want to make sure that you fully understand what is going on here." The court then listed the evidence that the Government planned to present during the course of the trial and said: "Now, again, I don't know what the status was at any time about the plea negotiations in this case, and I don't know if there is a possibility for any further discussions." The court continued, "before we go forward, I felt it my responsibility, my responsibility to address each of you individually to let you know what you are facing here . . . ." The court pointed out that, in its view, Oscar Bennett's testimony on the first day of trial demonstrated that the Government's predictions during its opening statement about the strength of the evidence against the Defendants "were right on." The court emphasized that a life sentence in federal court is truly a life sentence: "You are all young men, and if there was a chance that later in life, you could be released back into the community, I think it is something you seriously need to consider . . . ."

In response to the court's comments, counsel for Bennett described his plea negotiations with the Government. The Government had offered Bennett the opportunity to plead to a possession count with a recommended sentence of ten years; Bennett signed that agreement but later rejected it during the Rule 11 colloquy discussed above. Counsel for Bennett indicated that he later tried to negotiate for a sentence of fifteen years but that those efforts were unsuccessful. Counsel for Jones indicated that Jones would have been willing to agree to a plea for a sentence of ten to fifteen years but had been unable to reach an agreement with the Government. The court then said, "frankly, based on what I am hearing now, . . . your clients may be better off pleading to the indictment. And I say that in all candor." Counsel for Bradley responded that his client would have been willing to plead to the firearms count, which carried a maximum sentence of ten years, but the Government was not willing to go below fifteen years.

The court then asked the prosecutors to return to the courtroom and indicated that "I have real concern that there may well be a miscarriage of justice taking place in this courtroom." The court explained that his colloquy with the Defendants and their counsel suggested "that we are now in the third day of what is likely to be a five- or six-week trial that really nobody wants to take place." The court noted,

> As we all know, if [the Defendants] go to trial, the likelihood of a life sentence is very real and very substantial. Part of my motivation for asking [the Government] to leave the room in the first place, not knowing where this discussion was going to lead, was to give each of the defendants an opportunity to address me, if he chose, after having had the benefit of the *voir dire* process, [the prosecutor's] excellent opening statement, and Mr. Oscar Bennett's day-long testimony, which, to anybody sitting here, was obviously extraordinarily incriminatory of all the defendants. It is no big stretch, in fact, to observe that theoretically the government could rest its case right now on the basis of the testimony of the one witness. If the fact finder believed Mr. Oscar Bennett's testimony, or most of it, the case would essentially be over. Counsel for the Government stated that the Government had negotiated in good faith and that it

stood "ready to offer a plea agreement that is consistent with justice in this case." The court replied that it would dismiss the jury early for lunch "to give you folks a chance to see whether this rather unusual hearing might result in a termination of these proceedings."

The court cautioned, "This is very dangerous because if the proceedings are not terminated, there is the risk that the Court even took in initiating this exchange with counsel that one or more of the defendants . . . or an appellate court could regard the Court's actions as inappropriate, and, in some form or fashion, coercive." The court stated, however, that it was not its intention to coerce anyone. The court also indicated that it was mystified as to why Bennett refused to plead guilty after signing the initial plea agreement: "I don't know what it was that caused that plea to break down. It was a wonderful offer. It was an incredible offer."

After a three-hour recess, the Government told the court that the parties had been unable to reach an agreement. The court asked why negotiations had been unsuccessful, and Jones's counsel responded that there were problems with the sentence. The court expressed puzzlement that the recommended sentence in the plea agreement presented a stumbling block because the court made sentencing decisions and was not bound by the sentence set forth in a plea agreement. At this point, counsel for Bradley stated that Bradley wanted to plead to the indictment. The Rule 11 colloquy commenced; however during the colloquy, Bradley stated that he was not guilty of the conspiracy count, and the district court refused to accept his plea. Bradley subsequently indicated that he wished to continue with the trial.

The trial continued for more than two weeks, during which the Government presented numerous witnesses who testified about the conspiracy. On February 12, 2002, the court again raised the possibility of guilty pleas: "We are in the third week of trial, and I just again ask the question, is this really what the defendants want to do?" The court continued, "They want to continue to sit through this for the next three weeks? And, again, we have not even gotten to the heart of the government's case, the murders, the autopsies." The court then proceeded to discuss the case that the Government had presented against the defendants:

> [I]t appears to the Court that everybody who was involved
> is either dead or is a witness in this case. That is why I keep
> asking you. I don't understand why you continue to sit
> through this trial, to be perfectly blunt about it. Everybody
> who has been involved apparently is going to come in here
> and talk about this conspiracy.

The court then asked each defendant individually if he was being intimidated or coerced into going to trial rather than pleading guilty; each defendant answered in the negative.

Shortly after this exchange, Bradley stated that he wanted to plead guilty. During this plea colloquy — Bradley's second — the court realized that pleading guilty to the charges in the federal case would require Bradley to in effect also plead guilty to the pending charges in state court. Bradley's attorney stated that there had been plea negotiations at the state level, but that the state charges remained unresolved. Bradley asked for an opportunity to consult with his lawyer regarding the outstanding state charges, and the court agreed. The court again noted its surprise that both Bradley and Bennett had turned down plea deals that would have resulted in sentences of ten years: "That really just absolutely boggles my mind. It absolutely boggles my mind. . . . It's really sad."

At the end of that day's proceedings, the court expressed sadness that the Defendants had not taken advantage of the "very, very favorable, I would even say extraordinarily favorable, plea offers that have been made." The court said:

> [T]he reason we are so taken by this case is because this
> would appear — nobody can predict what this jury is going
> to do, nobody can ever predict what a jury is going to do,
> but from all appearances, this is one of the strongest cases
> ever to be brought in this courthouse.

> \* \* \*

> The reason we don't see cases of this sort very often,
> frankly, in this courtroom going to trial is because the unfor-

tunates who get involved in the drug trade come to recognize eventually, even if they don't at first, that there is benefit in not pushing the government to actually do what the government is prepared in every case to do, and that is to marshal evidence to produce against the defendants who are indicted, . . . to prove guilt beyond a reasonable doubt.

I am very, very, very sad that these three young men fought their attorneys, and I use that term advisedly, and have, for reasons that are totally beyond me, and, again, I see their families sitting up there day in and day out, why they would do what they have in this case, which is to say why they would not think seriously about trying to dispose of the charges against them on a reasonable basis.

The court then asked the Defendants if they had anything to say. Jones objected to "the way you keep on judging us." The court responded that the jury would be judging them, not the court. Jones replied: "You keep telling us to cop out, like we are already guilty." The court replied, "I keep telling you that you are presumed innocent." Jones then stated, "It don't seem like it." Jones went on to state that he was not satisfied with the plea option the Government had presented to him: "The only deal they give is they tell [us] to cooperate or go to trial. I'm going to trial because I won't cooperate with them."

On the next day, February 13, Bennett's attorney indicated that Bennett wanted to plead guilty to the indictment. The court responded that, at that stage in the trial, it would only accept guilty pleas if all three defendants agreed to plead guilty. The trial continued. Six days later, on February 19, all three defendants stated that they wanted to plead guilty to the indictment. Jones, however, was having difficulty coordinating his federal plea with the charges pending against him in state court. The district court offered to contact the state judge to expedite matters. The next day, the court announced that it had discussed Jones's situation with the state judge and that the state court had agreed to impose a 25-year state sentence to run concurrently to any federal sentence.

During the Rule 11 colloquy, the Government pointed out that, because the firearms convictions would be "stacked consecutively,"

Bennett faced a mandatory minimum sentence of 40 years. Bennett stated that he was not willing to plead guilty given this mandatory minimum, to which the court responded, "I don't blame you." The court asked if the Government would be willing to dismiss one of the firearms counts. The prosecutor responded that he would need to get permission. After a recess, the United States Attorney for the District of Maryland appeared in the courtroom and stated that the Government would dismiss one of the firearms charges against Bennett if he were willing to plead guilty, bringing Bennett's mandatory minimum sentence on that count down to 20 years. At the conclusion of the Rule 11 colloquy, in which the court properly informed Bennett and Jones that they faced possible life sentences, the court accepted all three defendants' guilty pleas.

At sentencing, the court sentenced Bradley to 296 months (24.5 years), Jones to 720 months (60 years), and Bennett to life with a 120-month consecutive sentence.[2]

## II.

Federal Rule of Criminal Procedure 11 governs guilty pleas and clearly prohibits a court from participating in plea negotiations. The Rule provides: "An attorney for the government and the defendant's attorney, or the defendant, when proceeding pro se, may discuss and reach a plea agreement. *The court must not participate in these discussions.*" Fed. R. Crim. P. 11(c)(1) (emphasis added).[3] As we have previously noted, courts have "widely viewed" Rule 11(c)(1)'s prohibition as serving three principal interests: "it diminishes the possibility of judicial coercion of a guilty plea"; it protects against unfairness

---

[2]Although the Defendants did not enter their pleas until the third week of trial, the district court granted each of them a three-level reduction for acceptance of responsibility. Nevertheless, the seriousness of their crimes still led the court to impose lengthy sentences. Bennett and Jones maintain that although they pleaded guilty, "they fared no better" than they would have if they had proceeded to trial and been convicted of all offenses.

[3]Prior to the 2002 revisions to the Federal Rules of Criminal Procedure, Rule 11(e)(1) contained the prohibition against judicial participation in plea negotiations.

and partiality in the judicial process; and it eliminates the "misleading impression" that the judge is "an advocate for the agreement" rather "than a neutral arbiter." *United States v. Cannady*, 283 F.3d 641, 644-45 (4th Cir. 2002) (internal quotation marks omitted).

First, the prohibition on judicial involvement in plea negotiations guards against "the high and unacceptable risk of coercing a defendant" to enter into an involuntary guilty plea. *United States v. Casallas*, 59 F.3d 1173, 1178 (11th Cir. 1995) (quoting *United States v. Bruce*, 976 F.2d 552, 556-57 (9th Cir. 1992)). A coerced plea, of course, would violate a defendant's fundamental constitutional rights, *see Waley v. Johnston*, 316 U.S. 101, 104 (1942) (per curiam), and "a judge's participation in plea negotiation is inherently coercive." *United States v. Barrett*, 982 F.2d 193, 194 (6th Cir. 1992). In facilitating a plea, a "judge communicate[s] to the defendant that he desire[s] a plea" and so "raise[s] the possibility, if only in the defendant's mind, that a refusal to accept the judge's preferred disposition would be punished." *Id.* "The defendant may fear that rejection of the plea will mean imposition of a more severe sentence after trial or decrease his chances of obtaining a fair trial before a judge whom he has challenged." *United States v. Werker*, 535 F.2d 198, 202 (2d Cir. 1976).

Second, prohibiting judicial participation in plea negotiations also "preserve[s] the judge's impartiality" both during and after the plea negotiations. *United States v. Bruce*, 976 F.2d 552, 557 (9th Cir. 1992). Without this prohibition there is "a real danger that a judge's neutrality can be compromised." *Barrett*, 982 F.2d at 195. "By encouraging a particular agreement, the judge may feel personally involved, and thus, resent the defendant's rejection of his advice." *Cannady*, 283 F.3d at 644 (internal quotation marks omitted). Judicial involvement in plea negotiations also "makes it difficult for a judge to objectively assess the voluntariness of the plea," may affect the judge's ability to preside impartially over a trial if the defendant rejects the plea agreement, and may "diminish[ ] the judge's objectivity in post-trial matters such as sentencing and motions for a judgment of acquittal." *Bruce*, 976 F.2d at 557-58 (internal quotation marks and citation omitted).

Finally, Rule 11(c)(1)'s prohibition is necessary to prevent the impression of the court being anything less than a neutral arbiter dur-

ing the course of the negotiations. The prohibition "recognizes that participation in the plea bargaining process depreciates the image of the trial judge" as a fair and neutral arbiter, an image "that is necessary to public confidence in the impartial and objective administration of criminal justice." *Werker*, 535 F.2d at 203. When a judge partakes in plea discussions, a defendant may well "view the judge as an adversary . . . rather than as the embodiment of his guarantee of a fair trial and just sentence." *Bruce*, 976 F.2d at 557 (internal quotation marks omitted). Clearly, the "interests of justice are best served if the judge remains aloof from all discussions preliminary to the determination of guilt or innocence so that his impartiality and objectivity shall not be open to any question." *Werker*, 535 F.2d at 203.

Thus, Rule 11(c)(1)'s prohibition on judicial involvement in plea negotiations not only helps to ensure the voluntariness of a defendant's guilty plea; it also protects the integrity of the court and preserves public confidence in the judicial process.

### III.

Before we apply Rule 11 to this case, we must first determine the proper standard of review. The Government maintains that because "none of the defendants objected" in the district court to judicial participation in plea negotiations, we must review their claim under the rigorous plain error standard. That is, the Defendants must demonstrate that (1) the asserted violation of Rule 11(c)(1) is error, (2) the error is plain, and (3) the error affected their substantial rights; if these three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) "the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 731-32 (1993) (internal quotation marks and citation omitted). In contrast, the Defendants contend that a district court's participation in plea negotiations constitutes a structural error justifying reversal even if a defendant cannot show prejudice. *See Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991) (discussing various structural errors).

A court's participation in plea negotiations does have some parallels to structural defects recognized by the Supreme Court, like the denial of the right to an impartial judge. However, after careful

review of Rule 11 itself and the cases interpreting it, we believe plain error review (or, if an objection has been lodged in the district court, harmless error review) more fully accords with the text of the rule and with precedent.

First, Rule 11(h) itself provides that "[a] variance from the requirements of this rule is harmless error if it does not affect substantial rights." Fed. R. Crim. Pro. 11(h). Moreover, in *United States v. Vonn*, 535 U.S. 55, 59-62 (2002), the Supreme Court seemed to reject the view that a Rule 11 error could constitute structural error, *see id.* at 66-71; rather the court indicated that all forfeited Rule 11 errors were subject to plain error review. *See id.* at 59. ("We hold that a silent defendant has the burden to satisfy the plain-error rule and that a reviewing court may consult the whole record when considering the effect of any error on substantial rights."). *See also United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2336 (2004) ("Because the claim of Rule 11 error was not preserved by timely objection, the plain error standard of Rule 52(b) applies."); *United States v. Martinez*, 277 F.3d 517, 525 (4th Cir. 2002) (holding pre-*Vonn* that "[p]lain error analysis is the proper standard for review of forfeited error in the Rule 11 context.").

In the wake of *Vonn*, we have indicated that a contention like the one at issue here — that the district court impermissibly participated in plea negotiations — is not structural error, but rather is subject to plain error review. *See Cannady*, 283 F.3d at 647 n.5 ("Nothing in the record suggests that Cannady ever raised this argument below, which would require review of the issue under a plain error standard." (citing *Vonn*, 535 U.S. at 61-64)). Other courts have reached the same conclusion. *United States v. Ebel*, 299 F.3d 187 (3d Cir. 2002) (finding that district court's impermissible participation in plea negotiations required plain error analysis in light of *Vonn*); *United States v. Diaz*, 138 F.3d 1359, 1362-63 (11th Cir. 1998) (refusing to reverse conviction despite judge's participation in negotiations because defendant could not show prejudice); *see also United States v. Miles*, 10 F.3d 1135, 1140-41 (5th Cir. 1993) (applying harmless error review to claim that district court participated in plea negotiations).

We continue to believe that this is the appropriate standard of review and so hold. Accordingly, in this case, because the Defendants

neither objected to the district court's involvement in plea discussions, nor attempted to withdraw their pleas, we subject their appellate contentions to the rigorous plain error standard. This means that we will not presume prejudice. Rather, in order to prevail, Bradley, Jones, and Bennett must demonstrate not only the existence of plain error but also that this error affected their substantial rights; we must further be convinced that a refusal to notice the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings. *See Olano*, 507 U.S. at 731-32. We consider the entire record in determining whether these requirements have been met. *See Vonn*, 535 U.S. at 65-66.

With these principles in mind, we turn to the case at hand.

IV.

In this case, the Government concedes that the district court repeatedly violated Rule 11's prohibition on judicial participation in plea negotiations, that this participation was error, and that the error was plain. The record clearly demonstrates that the district court initiated plea discussions, advised the Defendants that they might "be better off pleading to the indictment," suggested that they would likely receive life sentences if they went to trial, commented on the amount and weight of the Government's evidence, criticized the Defendants for turning down plea offers from the Government, urged the Defendants to attempt "to dispose of the charges against them on a reasonable basis," and explained to the Defendants that even if the prosecution would not recommend the sentence the Defendants desired, this should not prevent a plea because the court — not the prosecution — would determine the sentence. In sum, as the Government recognizes, the Defendants have established plain Rule 11 error.

The record here thus markedly differs from cases in which judicial comments after completion of the plea agreement or a single brief remark during negotiations have been held not to constitute impermissible judicial participation in plea discussions. *Compare Cannady*, 283 F.3d at 644 (holding that court's comments after "the parties had reached a definite agreement that had been reduced to writing and executed by [the defendant] and the government, all without any direct involvement by the district judge" did not violate Rule 11);

*United States v. Bierd*, 217 F.3d 15, 21 (1st Cir. 2000) (holding that court's mention of a guilty plea and acceptance of responsibility to defense counsel was not reversible error); *United States v. Johnson*, 89 F.3d 778, 783 (11th Cir. 1996) (finding no improper participation when the court warned the defendant of the risk involved in pleading guilty to the substantive offense and contesting the conspiracy charge).

Accordingly, we turn our attention to the remaining requirements that must be met in order for the Defendants to prevail here — that the error affected the Defendants' substantial rights and that refusal to notice the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings. As the Fifth Circuit has recognized, it will be rare that a clear violation of Rule 11's prohibition against judicial involvement in plea negotiations does not affect substantial rights. *See Miles*, 10 F.3d at 1141 (noting that it had found no case holding that when a judge truly participated in plea negotiations, the participation did not affect substantial rights). Similarly, given the critical interests served by the prohibition — preserving "the judge's impartiality" throughout the proceedings and preventing the public from gaining the "misleading impression" that a judge is anything less than a "neutral arbiter," *Cannady* 283 F.3d at 644-45 — failure to notice this sort of clear Rule 11 error would almost inevitably seriously affect the fairness and integrity of judicial proceedings.

The Government argues, however, that neither requirement can be met in this case because the Defendants encouraged the district court's involvement in the plea negotiations.[4] The Government particularly emphasizes defense counsel's efforts to effect the guilty pleas:

---

[4]The Government does *not* argue that the Defendants or their lawyers *invited* the error. Indeed, at oral argument counsel for the Government properly conceded that the record did not provide evidence on which to base an invited error claim. That concession is well taken. *See e.g.*, *United States v. Jackson*, 124 F.3d 607, 617 (4th Cir. 1997) ("The invited error doctrine recognizes that a court cannot be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request." (internal quotation marks omitted)). In this case, the district court, not defense counsel, initiated the discussion regarding plea negotiations.

"[T]he very same lawyers who now contend that their clients were coerced into pleading guilty, counseled their clients at trial to do so and went to considerable lengths to engineer the terms pursuant to which the defendants pleaded guilty." Brief of Appellee at 33. However, the failure of defense counsel to recognize and to seek to avoid the Rule 11 error at trial, while unfortunate, does not provide a basis for finding that the error did not affect Defendants' substantial rights or that a refusal to notice the error would not seriously affect the fairness, integrity, and public reputation of judicial proceedings.

Indeed, the Government's argument totally ignores the applicable standard for determining the effect on substantial rights in cases involving Rule 11 violations. In making this determination, we do *not* examine whether defense counsel participated in the error. Instead, we simply ask whether there is "a reasonable probability that, but for the error," the defendant would have pleaded guilty. *Dominguez Benitez*, 124 S. Ct. at 2340. In this case, the record clearly indicates a "reasonable probability" that, absent judicial involvement, the Defendants would not have entered guilty pleas.

Although all three defendants did indicate interest in reaching plea agreements, they were only interested in a deal on their own terms. When the Government refused to agree to terms of their liking, the Defendants repeatedly rejected the Government's plea offers and were content to take their chances at trial. To cite just three examples: Jones refused to consider a plea agreement that would have required him to cooperate with the Government; on two occasions Bradley refused to go forward with a guilty plea during the Rule 11 colloquy; and, even after two weeks of trial and countless warnings from the court, Bennett was not willing to enter a guilty plea unless the Government agreed to dismiss one of the counts against him. In fact, despite virtually endless negotiations by counsel and the district court's repeated encouragement, the Defendants *never* were able to reach an agreement with the Government. They ultimately agreed to plead to the indictment but only after the court expressly told them that in its view they might be "better off" doing so. Judicial encouragement to plead guilty was so clear that one defendant (Jones) complained of it to the district court: "You keep telling us to cop out, like we are already guilty."

Thus, a fair reading of the record in this case leads to the inevitable conclusion that there is a "reasonable probability" that the Defendants would not have pleaded guilty in the midst of trial without the district court's criticizing their decision to reject plea offers from the Government, repeatedly questioning their reasons for proceeding with the trial, and advising them to plead to the indictment. Indeed, even with the court's repeated interventions and involvement in negotiations, which began at the outset of the trial, the Defendants did not enter a guilty plea until the trial had been underway for over two weeks. Although we have no doubt that the district court had the best of intentions,[5] judicial involvement in the plea negotiations nevertheless unacceptably influenced the Defendants' decision to plead guilty. Accordingly, the Defendants have demonstrated that the plain Rule 11 error affected their substantial rights.

Moreover, after careful review of the entire record in this case, we can only conclude that refusing to notice this plain error would seriously affect the fairness, integrity and public reputation of judicial proceedings. We have not found a single case in which the extent of judicial involvement in plea negotiations equalled that in the case at hand. The district court repeatedly appeared to be an advocate for the pleas rather than as a neutral arbiter, and any fair reading of the record reveals the substantial risk of coerced guilty pleas. Even if, as the Government claims, it could have presented uncontroverted evidence of the Defendants' guilt if the trial had proceeded to verdict, we cannot refuse to notice the repeated judicial intervention in the plea negotiations. The fact is, the jury rendered no verdict in this case; there has been no "fair and reliable determination" of the Defendants' guilt. *Compare United States v. Cedelle*, 89 F.3d 181, 186 (4th Cir. 1996); *see also Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("[T]o hypothesize a guilty verdict that was never in fact rendered — no matter how inescapable the findings to support that verdict might be — would violate the jury-trial guarantee.").

---

[5]The experienced district judge seems to have recognized the existence of a prohibition on judicial participation in plea negotiations. It appears, however, that the Defendants' youth and their lack of experience in the federal system caused the court to overlook the seriousness of the problems inherent in the court's involvement in the plea discussions in this case.

Furthermore, contrary to the Government's contentions, on these facts defense counsel's willing participation in plea discussions with the court does not in any way alleviate the impact of judicial participation on the fairness, integrity, and public reputation of the proceeding. Defense counsel's actions do not eliminate the coercion apparent in the plea negotiations, nor do they somehow substitute for a fair and reliable determination of guilt. The record strongly indicates that the Defendants repeatedly ignored their counsel's advice to enter guilty pleas. Only the district court's repeated statements to the Defendants that the Government's case was very strong and that they might be better off pleading guilty to the indictment seem to have persuaded them to do so. Thus, defense counsel's conduct provided no "cure" for the coercive effect of the district court's involvement. We can only conclude that the district court's role as advocate for the Defendants' guilty pleas affected the fairness, integrity, and public reputation of judicial proceedings.

We do not suggest that the district court improperly intended to coerce involuntary guilty pleas, but the fact is:

> [t]he unequal positions of the judge and the accused, one with the power to commit to prison and the other deeply concerned to avoid prison, at once raise a question of fundamental fairness. When a judge becomes a participant in plea bargaining he brings to bear the full force and majesty of his office. His awesome power to impose a substantially longer or even maximum sentence in excess of that proposed is present whether referred to or not.

*Barrett*, 982 F.2d at 194 (quoting *United States ex rel. Elkins v. Gilligan*, 256 F. Supp. 244, 254 (S.D.N.Y. 1966)). Accordingly, we hold that we must notice the plain error in this case.

V.

For the foregoing reasons, the judgment of the district court is vacated and the case is remanded for further proceedings in which the Defendants will be permitted to withdraw their guilty pleas. We also remand the case for assignment to another district judge. *See Miles*, 10 F.3d at 1142; *United States v. Corbitt*, 996 F.2d 1132, 1135 (11th

Cir. 1993). We have little doubt that the district judge could be totally objective on remand, but our faith in his objectivity does not affect our decision. "Regardless of the judge's objectivity, it is the defendant's perception of the judge that will determine whether the defendant will feel coerced to enter a plea." *Barrett*, 982 F.2d at 196 (quoting *Werker*, 535 F.2d at 202) (internal quotation marks omitted). Accordingly, we vacate the district court's judgment and remand for assignment to a different district judge.

*VACATED AND REMANDED*