**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 13-4937**

---

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

     v.

OLUWASEUN SANYA,

               Defendant - Appellant.

---

**No. 13-4938**

---

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

     v.

OLUWASEUN SANYA,

               Defendant - Appellant.

---

Appeals from the United States District Court for the District of Maryland, at Greenbelt.  Peter J. Messitte, Senior District Judge.  (8:13-cr-00121-PJM-1; 8:12-cr-00379-PJM-1)

---

Argued:  October 30, 2014      Decided:  December 17, 2014

---

Before WILKINSON, MOTZ, and FLOYD, Circuit Judges.

---

Vacated and remanded by published opinion. Judge Motz wrote the majority opinion, in which Judge Floyd joined. Judge Wilkinson wrote a separate concurring opinion.

––––––––––––

**ARGUED:** Byron Brandon Warnken, Jr., WARNKEN, LLC, Pikesville, Maryland, for Appellant. Sujit Raman, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Byron L. Warnken, WARNKEN, LLC, Pikesville, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

––––––––––––

DIANA GRIBBON MOTZ, Circuit Judge:

Oluwaseun Sanya contends that his guilty plea to access-device fraud and aggravated identity theft was involuntary because the district court impermissibly participated in plea negotiations. We agree that the district court committed reversible error and so vacate and remand for further proceedings.

I.

In July 2012, Sanya pleaded guilty to one count of conspiracy to commit access-device fraud in violation of 18 U.S.C. § 1029(b)(2). As early as 2010, Sanya had begun operation of a large-scale credit card fraud scheme. He recruited employees of various restaurants and other businesses to steal customers' credit card information by using an electronic device that he provided. With this stolen credit card information, Sanya made counterfeit credit cards, which co-conspirators then used to purchase gift cards. The fraudulently purchased, but otherwise legitimate, gift cards were then used to buy consumer goods that the co-conspirators later returned for cash. In this way, Sanya used the stolen credit cards to amass substantial amounts of money.

After his July 2012 plea, Sanya was released pending sentencing under several conditions, including that he commit no

3

further crimes. Unfortunately, upon his release, Sanya promptly resumed operation of his credit card fraud scheme. Indeed, in September 2012 -- a mere six weeks after his release -- security officials at a store in Abingdon, Maryland, noticed the suspicious behavior of Sanya's co-conspirators and called the local police. Officers responded to the scene, arrested Sanya, and after an investigation, charged him with numerous state crimes and retained him in state custody. When federal officials learned of Sanya's arrest, he was transferred to federal custody, and the state charges were dismissed. On March 13, 2013, a federal grand jury indicted Sanya of access-device fraud and other charges, including aggravated identity theft.

Sanya's sentencing for the initial access-device fraud offense -- to which he had pleaded guilty in July -- was postponed while the Government and Sanya's counsel attempted to negotiate a plea that would resolve the second offenses and consolidate all of Sanya's offenses for sentencing. Sanya, however, rejected the Government's offer, and at the time of his May 2013 detention hearing on the second offenses, the parties had failed to reach any plea agreement.

Learning of Sanya's intransigence at that detention hearing, the district judge expressed his strong preference that Sanya enter a plea to the second set of charges and agree to have those charges and the initial access-device fraud charge

4

consolidated for sentencing. In so doing, the court repeatedly opined that such a plea would be beneficial to Sanya's interests. After hearing the judge's exhortations, Sanya changed course and expressed a willingness to work toward such a result.

Five days later, Sanya executed a plea agreement covering the second set of charges. The plea was entered the next month, before the same district judge, with Sanya pleading guilty to one count of access-device fraud in violation of 18 U.S.C. § 1029(a)(2), as well as one count of aggravated identity theft in violation of 18 U.S.C. § 1028A. These charges were then consolidated with the initial access-device charge for sentencing. At the consolidated sentencing hearing, before the same district judge, the court sentenced Sanya to 90 months' imprisonment for the single initial count of conspiracy to commit device fraud; 188 months for the September count of device fraud, to be served concurrently with the 90-month sentence; and 24 months for the September count of aggravated identity theft, to be served consecutively, for a total of 212 months' imprisonment. Sanya timely noted this appeal.

II.

Sanya contends that, in violation of Federal Rule of Criminal Procedure 11(c)(1), the district court improperly

5

participated in plea discussions, rendering his plea to the September crimes invalid.

Rule 11(c) provides that "[a]n attorney for the government and the defendant's attorney . . . may discuss and reach a plea agreement," but "[t]he court must not participate in these discussions." Fed. R. Crim. P. 11(c)(1). This prohibition on judicial involvement serves "three principal interests: it diminishes the possibility of judicial coercion of a guilty plea; it protects against unfairness and partiality in the judicial process; and it eliminates the misleading impression that the judge is an advocate for the agreement rather than a neutral arbiter." United States v. Bradley, 455 F.3d 453, 460 (2006) (quoting United States v. Cannady, 283 F.3d 641, 644-45 (4th Cir. 2002)) (internal quotation marks omitted).

Because Sanya neither objected to the judge's involvement in plea discussions, nor made an attempt to withdraw his guilty plea, we consider his appellate argument under the rigorous plain error standard. See United States v. Davila (Davila I), 133 S.Ct. 2139, 2147 (2013); Bradley, 455 F.3d at 462. To prevail on a claim of plain error, Sanya must demonstrate not only that the district court plainly erred, but also that this error affected his substantial rights. United States v. Olano, 507 U.S. 725, 731-32 (1993). In the Rule 11 context, this inquiry means that Sanya must demonstrate a "reasonable

probability that, but for the error," he would not have pleaded guilty. Bradley, 455 F.3d at 463 (internal citation omitted). Further, we will not correct any error unless we are convinced that a refusal to do so would "seriously affect the fairness, integrity or public reputation of judicial proceedings." Id. In determining whether these requirements have been met, we consider the "full record." Davila I, 133 S.Ct. at 2150; see also Bradley, 455 F.3d at 462 ("[w]e consider the entire record").

With these principles in mind, we turn to their application in this case.

## III.

### A.

We first determine whether the district court plainly erred. Olano, 507 U.S. at 731-32. The Government properly concedes that the district court "likely erred by involving itself in plea negotiations," but briefly contends that the error was not plain. Appellee's Br. at 30, 37 n.13. The initial concession is well taken; the latter contention is not.

Of course, a district court does not run afoul of Rule 11 simply by mentioning the possibility of a plea. Indeed, in Bradley, we distinguished a case requiring reversal because of judicial interference from those in which "a single brief remark

7

during negotiations" or "judicial comments after completion of the plea agreement" have been held not to constitute impermissible judicial involvement in plea discussions. 455 F.3d at 462 (citing cases). The district court's comments here, however, were neither brief nor made after a plea deal had been struck.

Rather, the court repeatedly intimated that a plea to the September charges was in Sanya's best interests. See J.A. 167 ("It seems to me [a plea] may stand your client a lot better."); J.A. 168 ("So that's why I think a global resolution of this makes an awful lot of sense."); J.A. 169 ("So, again, it's just one of those cases where it feels like a global settlement makes sense.").[1] Moreover, the court strongly suggested that Sanya would receive a more favorable sentence if he agreed to plead guilty to the September charges and to consolidate all charges for sentencing. See J.A. 167-68 ("[I]f you do one [case at a time] and I sentence and I come back and I have a trial or whatever and he gets convicted, he stands to face another new package; whereas . . . I can't move it down from what it is."); J.A. 169 ("And then you have got a trial where he is going to face another package and who knows where the numbers go at that point."); J.A. 172 ("But sometimes it's possible, and I can't

---

[1] All citations to the J.A. refer to the joint appendix filed by the parties in this appeal.

8

say this with certainty, that he ends up with a less -- less pleasant sentence if we take this in two pieces . . . than if we take it in one."); J.A. 171 ("Better to get all this wrapped in one."). Finally, the court also commented on the strength of the Government's case. See J.A. 167 ("Magistrate Judge Day said . . . in his detention order, [t]he government's case looks pretty strong in this second case."). These repeated remarks clearly constitute judicial participation in plea discussions, and the district court erred in engaging in them.

Just as clearly, this error was plain. Rule 11(c) is not new, and the doctrine surrounding its interpretation is well-settled. The Rules Committee adopted -- and the Supreme Court approved -- what is now Rule 11(c) in substantially its present form many years prior to the hearing at issue in this case. See Davila I, 133 S.Ct. at 2146; Fed. R. Crim. P. 11 advisory committee's note on 1974 amendment. Furthermore, like our sister circuits, we have consistently warned that a district court errs in urging defendants to accept offers to plead. See, e.g., Bradley, 455 F.3d at 462; United States v. Baker, 489 F.3d 366, 373 (D.C. Cir. 2007); United States v. Rodriguez, 197 F.3d 156, 158-59 (5th Cir. 1999); United States v. Kraus, 137 F.3d 447, 452 (7th Cir. 1998). Thus, we can only conclude that the

9

court's discussion of and advocacy for a plea and "global resolution" constituted plain error.[2]

B.

We must next determine whether the error affected Sanya's "substantial rights." Olano, 507 U.S. at 731-32. In doing so, we simply ask whether there is "a reasonable probability that, but for the error, he would not have entered the plea." United States v. Dominguez Benitez, 542 U.S. 74, 83 (2004). Our close examination of the full record leads us to conclude that Sanya has demonstrated such a "reasonable probability."

i.

At the beginning of the hearing, defense counsel made clear that, despite his recommendation that Sanya plead and agree to a global resolution, Sanya had "declined the [Government's plea]

---

[2] The Government misses the mark in suggesting that Sanya invited this error. "The invited error doctrine recognizes that a court cannot be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request." United States v. Jackson, 124 F.3d 607, 617 (4th Cir. 1997) (internal citation and quotation marks omitted). The Government argues that Sanya's counsel "consciously turn[ed] the subject of the hearing" toward the potential plea in hopes that the court could convince Sanya to take the Government's offer. Appellant's Br. 35-37. Although Sanya's counsel alluded to the prospect of a "global resolution," and may well have appreciated the district court's enthusiasm for a plea and "global settlement," the record does not offer any support for the view that defense counsel asked or suggested that the court participate in plea negotiations. Thus, the court's error in doing so was not invited.

10

offer." J.A. 167.[3] The district court then responded with a series of exhortations as to why it would be advantageous for Sanya to plead. After commenting that although "I obviously can't make you do this" -- i.e., plead guilty in the second case -- the court opined that it might "stand [Sanya] a lot better" to do so. J.A. 167.

Over the course of this hearing, after commenting on the strength of the Government's case against Sanya, the court repeatedly expressed its view that a plea to the second set of charges and a "global resolution" would be to Sanya's advantage, intimating that he would receive a more lenient sentence if he did so. See J.A. 167, 168, 169.[4] And the court clearly

---

[3] From the outset, Sanya had demonstrated a desire to go to trial on the second set of charges. Thus, within weeks of his indictment on those charges, he had filed several pretrial motions, including a motion in limine. J.A. 11 ¶ 5, 7. The docket does indicate that ten days after Sanya filed this motion, a "guilty plea/rearraignment" was scheduled. The Government, without citation to anything other than this docket entry, asserts that Sanya "accepted a plea offer." Appellee's Br. 10. But this early plea hearing apparently never took place and the record contains no early plea. Sanya contends that he had "considered taking a plea" but "up until the time of the judicial interjection, [he] had affirmatively decided not to accept the plea bargain." Reply Br. 1-2. Even this consideration seems brief, for less than a week after the scheduled "guilty/plea rearraignment" hearing, the parties were again preparing for trial, as evidenced by the filing of numerous additional pretrial motions. See J.A. 11-12 ¶¶ 9-15.

[4] Shortly after one such suggestion, the district court noted "I can't get involved in your negotiations." J.A. 168. The Government regards this disclaimer as significant. But (Continued)

11

highlighted the downside of <u>not</u> entering a plea, warning Sanya "who knows where the numbers will go" if he insisted on a trial. J.A. 169.

The district court's repeated comments about the advisability of a global plea agreement appear to have had an almost immediate effect on Sanya. Near the end of the hearing, Sanya conferred with his lawyer and conveyed an interest "in a global resolution." J.A. 171. This sudden and significant shift in attitude from the beginning of the hearing, when Sanya's lawyer indicated that Sanya "had declined [an] offer," J.A. 167, strongly suggests that his mid-hearing change of heart was the product of the district court's urging.

Even after Sanya expressed a tentative interest in negotiating a plea, the district court continued to send signals that Sanya would be well-served by reaching an agreement with the Government. Indeed, the court again suggested that Sanya would receive a more favorable sentence by pleading guilty and receiving a consolidated sentence, explaining "sometimes it's possible, and I can't say with certainty, that he ends up with a less -- less pleasant sentence if we take this in two pieces"

---

given that the court had already become involved in the negotiations, and, just moments after this disclaimer, once again extolled the merits of a "global" resolution, we cannot agree.

12

rather "than if we take it in one." J.A. 172. Further emphasizing the point, the court cautioned that "I think you need to understand that, Mr. Sanya. That's the reality of the way the system works." J.A. 172.

Sanya listened. Within just five days of this hearing, Sanya had executed a plea agreement. See J.A. 178-79. And within a month, the plea was entered and the two cases were set for a consolidated sentencing. Such close temporal proximity weighs heavily in favor of finding that Sanya's decision to plead guilty was the result of the district court's involvement in the plea negotiations. While other factors could have intervened during that short period and led Sanya to plead guilty, it is, at the very least, "reasonably probable" that the district court's comments during the May 10 hearing were the tipping point.

## ii.

In arguing to the contrary in its appellate brief, the Government simply ignores the facts set forth above. See Appellant's Br. 37-38. Instead, the Government contends that Sanya has failed to demonstrate the court's exhortations had any effect on his substantial rights because he did not object to the court's involvement either at the proper Rule 11 colloquy, or at sentencing, or by otherwise moving to withdraw his plea before this appeal. Id. at 38. Sanya's failure to object to

13

the error on any of these occasions of course provides the reason why he must meet the rigorous plain error standard. But this failure, in and of itself, does not provide a basis for concluding that Sanya failed to demonstrate a "reasonable probability" that his substantial rights were affected.

In a series of Rule 28(j) letters,[5] the Government switches gears and argues that cases from other circuits, reviewing entirely different records, "require the result" it seeks here. See United States v. Thompson, --- F.3d ---, 2014 WL 5334447 (8th Cir. Oct. 21, 2014); United States v. Davila (Davila II), 749 F.3d 982 (11th Cir. 2014); United States v. Castro, 736 F.3d 1308 (11th Cir. 2013). The Government's heavy reliance on cases from other courts, assessing other records, stands in considerable tension with the Supreme Court's recent and explicit teaching in Davila I as to the proper appellate review of a district court's participation in a guilty plea. The Davila I Court made crystal clear its "essential point . . . that particular facts and circumstances matter." 133 S.Ct. at 2149. Thus, in considering a district court's participation in

---

[5] In a three-week period, the Government filed _five_ Rule 28(j) letters in this case -- perhaps a record. The Rule requires that the body of any Rule 28(j) letter "not exceed 350 words." Fed. R. App. P. 28(j). Four of the Government's five letters exceeded this word limit; one exceeded a thousand words. We trust that in the future the Government will comply with the letter and spirit of Rule 28(j).

a plea negotiation, an appellate court must assess the "facts and circumstances" in the case before it.

It is the particular facts and circumstances in this case that lead us to conclude that Sanya has established a "reasonable probability" that, absent the error, he would not have entered the plea. These facts and circumstances differ in important respects from those in the cases on which the Government so heavily relies. First, in two of the Government's cases, the appellate courts appear to have applied an incorrect legal standard in assessing whether the defendant's substantial rights had been violated. To be sure, in both, the courts acknowledged the correct "reasonable probability" standard. Castro, 736 F.3d at 1313; Davila II, 749 F.3d at 993. But in both cases, the courts went on to explain that a defendant must do more than demonstrate a "reasonable probability" that, absent the error, he would not have pleaded guilty. Thus, in Castro, the court opined at some length that a defendant "must prove that but for the [district court's] error, he would not have entered the plea." Castro, 736 F.3d at 1314 (emphasis added). The court found Castro had not established a violation of his substantial rights because it was "not convinced that [he] would have rejected the plea agreement had the district court not advised him of the consequences of reneging on his plea agreement." Id. (emphasis added); see also id. at 1309, 1315.

15

In Davila II, the court again followed this flawed approach. See Davila II, 749 F.3d at 997 (noting that the defendant "must prove that the error made a difference in his decision," and "must prove more than that the record is consistent with his argument; he must show that the error actually did make a difference." (emphasis added) (internal quotation omitted)).

The Government repeats this incorrect standard in one of its Rule 28(j) letters, arguing that "Sanya, on plain error review, cannot surmount the 'daunting obstacle' of proving that, but for the Rule 11(c)(1) error, he would have gone to trial." Letter of October 30, 2014 (emphasis added) (quoting Castro, 736 F.3d at 1314); see also id. (reasoning that "if the effect of the error on the result in the district court is uncertain or indeterminate," the defendant "has failed to prove that the result would have been different . . . or his substantial rights have been affected" (emphasis added)).

The Government (and Castro and Davila II) are simply wrong in requiring a defendant to prove that "but for the Rule 11(c)(1) error, he would have gone to trial." Id. (emphasis added). The Supreme Court has clearly instructed that to establish a violation of substantial rights, a defendant need only demonstrate a "reasonable probability" that the error led him to enter the plea. Dominguez, 542 U.S. at 83. And the Court has painstakingly explained what it means by "reasonable

16

probability" -- a "defendant must thus satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding." Id. (citations omitted). Hence, contrary to the Government's contention (and the apparent practice in the two cases on which it most heavily relies), Sanya need not show that, "but for" the court's error, he would have gone to trial, or that this result was "certain." He need only demonstrate a "reasonable probability" that he would not have pleaded guilty absent the court's comments.

Moreover, all three of the cases on which the Government relies involve very different facts from those in the case at hand. Perhaps most importantly, the defendants in all of the Government's cases had agreed to terms in one or more plea agreements prior to the challenged comments by the district court. In Thompson, "[t]he day before the trial was to begin," the defendant "notified the district court he would plead guilty" and the "proposed plea agreement was provided to the district court for review." 2014 WL 5334447 at *1. Similarly, the defendants in Davila II and Castro both signed written plea agreements before later reneging and expressing a desire not to plead. Davila II, 749 F.3d at 995; Castro, 736 F.3d at 1310. Thus, when the defendants in those three cases appeared before

the district court, the court knew of and reacted to their stated earlier intent to plead guilty.

In stark contrast, the record in this case indisputably bears out Sanya's contention that when he appeared before the district court, the court had no reason to believe he intended to plead guilty. Indeed, Sanya's counsel explained at the outset of the hearing that although he had advised Sanya to agree to a plea and global resolution, Sanya had "declined the offer." J.A. 166-67. Notwithstanding its suggestion of an early aborted plea, see supra n.3, the Government does not contend to the contrary. This critical fact tellingly distinguishes Sanya's case from those on which the Government relies, and significantly undercuts the Government's contention that Sanya would have pleaded guilty even without the district court's urging.

Furthermore, the plea agreement Sanya ultimately did sign afforded him little in the way of benefits or concessions from the Government. Compare Castro, 736 F.3d at 1314 (plea permitted defendant to avoid "prosecution and punishment for seven offenses," including one "for which he faced mandatory sentence of 25 years . . . that had to run consecutively"). This fact further suggests that it was the district court's pre-plea intimation of a "less pleasant sentence if we take this in

18

two pieces," J.A. 172, rather than the plea deal itself, that changed Sanya's mind and led him to plead guilty.[6]

Additionally, unlike the defendant in Davila II, Sanya was urged to accept a plea by the same judge who sentenced him. And, in contrast to Castro, that judge repeatedly emphasized that he would be sentencing Sanya when urging him to plead, increasing the risk that Sanya felt coerced to do as the judge advised. Further, unlike either Thompson or Davila II, here the district court did indicate that pleading guilty would be in the defendant's best interests, even suggesting that the strength of the Government's case counseled in favor of striking a deal. See J.A. 167-68.

For all of these reasons, after close examination of the full record in this case, we can only conclude that Sanya has

---

[6] The Government points to Sanya's undocumented, apparently aborted, early agreement to plea, his assertion of diminished capacity to delay trial, and his procurement of new counsel for sentencing as "gamesmanship," relied on by the Castro court as proof that Rule 11 error did not affect substantial rights. See Castro, 736 F.3d at 1314-15. We find the argument unpersuasive for two reasons. First, the Castro court relied on "gamesmanship" to buttress an incorrect legal standard for asserting an effect on substantial rights, i.e., requiring Castro to prove that "but for" the judicial comments he would not have entered a plea. Second, the Castro court reasoned that "gamesmanship . . . suggest[ed] that [the defendant] decided to plead guilty because he did not want to forego a favorable agreement." Id. at 1314. In the case at hand, Sanya's conduct does not suggest he pleaded guilty to avoid "forego[ing] a favorable [plea] agreement" since Sanya did not avoid foregoing a favorable plea agreement.

19

established a reasonable probability that, absent the district judge's involvement, he would not have pleaded guilty to the second set of charges.

C.

We thus turn to the final inquiry -- whether refusing to notice this plain error, which Sanya has shown to have had a reasonable probability of affecting his substantial rights, would "seriously affect the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 736 (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)) (quotation marks omitted). We believe it would.

Although the district court's comments about the advantages of a plea to the second set of charges and consolidation of the two cases occurred in a single, short hearing, those comments were repeated and direct. Indeed, the court's exhortations saturated the hearing. Immediately upon receipt of those exhortations, Sanya withdrew his insistence on going to trial and agreed to consider both a plea to the second charges and the "global resolution" that the judge advised; five days later he signed a plea agreement that achieved that precise result.

We have consistently concluded:

> [G]iven the critical interests served by the prohibition [on judicial involvement in plea negotiations] -- preserving "the judge's impartiality throughout the proceedings and preventing the public from gaining the "misleading impression" that a judge

20

> is anything less than a "neutral arbiter" . . . --
> failure to notice this sort of clear Rule 11 error
> would almost inevitably seriously affect the fairness
> and integrity of judicial proceedings.

Bradley, 455 F.3d at 463 (quoting Cannady, 283 F.3d at 644-45).

The district court put Sanya "in a position that would be reasonably perceived by a defendant as inconsistent with the court's role as a neutral arbiter of justice." Baker, 489 F.3d at 375.

As our colleagues on the D.C. Circuit recently explained, "[w]hen a court appears to make a tacit offer of leniency in exchange for a guilty plea, even if that offer is accompanied by caveats, confidence in the court is undermined." Id. We therefore conclude, after close review of the entire record, that refusal to notice the plain error in this case would "seriously affect the fairness, integrity or public reputation of judicial proceedings." Olano, 507 U.S. at 736.

## IV.

We note that our review of the full record also leads us to conclude that the experienced district judge acted only with the best of intentions. The judge attempted to resolve Sanya's case not just expeditiously, but also fairly. We perceive no desire to coerce an involuntary plea.

21

Because, notwithstanding the district court's good intentions, our full record review reveals a reasonable probability that the court's plain error affected Sanya's substantial rights, and that failure to recognize this error would seriously undermine confidence in the fairness of judicial proceedings, we vacate the sentence imposed on Sanya and remand for further proceedings. On remand, Sanya can withdraw his guilty plea to the September 2012 charges (the subject of PJM 13-0121).[7] Of course, Sanya's agreement of July 2012, to plead guilty to the first charge (PJM 12-0379) still stands, because it was not affected by anything said at the May 2013 hearing.

As is usual, we also remand the case for assignment to a different district judge. See Baker, 489 F.3d at 376; Bradley, 455 F.3d at 465. We have absolutely no doubt that the original district judge could continue to preside fairly over this case. But "[r]egardless of the judge's objectivity, it is the defendant's perception of the judge that will determine whether

---

[7] Given our resolution of this issue, we need not reach Sanya's other appellate contentions; all are now moot. We do appreciate the Government's statement at oral argument that it will undertake to examine its standard plea agreement (which was used in this case) in order to eliminate possible ambiguous or contradictory provisions.

22

the defendant will feel coerced to enter a plea." Bradley, 455 F.3d at 465 (internal quotation marks and citations omitted).

VACATED AND REMANDED

WILKINSON, Circuit Judge, concurring:

I am pleased to concur in Judge Motz's fine opinion in this case. It underscores the wisdom of Rule 11's injunction to district courts to "not participate in [plea] discussions." Fed. R. Crim. P. 11(c)(1). Like my colleagues, I find it difficult to criticize the district court. See Maj. Op. Sect. IV. That court rightly recognized that defendants often benefit substantially from taking a plea. However, it failed to appreciate sufficiently that where, out of a belief in one's innocence, a desire to put the state to its proof, or a desire simply to roll the dice, defendants may, if they wish, risk deeply unfavorable outcomes by exercising a judicially unimpeded right to proceed to trial.

I.

I would emphasize, however, the Supreme Court's emphatic holding that Rule 11(c) violations are not structural errors, but are subject to harmless and plain error review. See Fed. R. Crim. P. 11(h), 52(a)-(b). In United States v. Davila, 133 S. Ct. 2139 (2013), the defendant contended that courts should automatically vacate convictions arising from plea agreements where the court engaged in "conduct banned by Rule 11(c)(1)" because "[w]hen a judge conveys his belief that pleading guilty would be to a defendant's advantage . . . [he] becomes, in effect, a second prosecutor, depriving the defendant of the

24

impartial arbiter to which he is entitled." Id. at 2148. Rule 11(c) violations, Davila argued, should be "no mere procedural technicality." Id.

Yet a holding of structural error would have vitiated the Supreme Court's long support for "the finality of guilty pleas." See id. at 2147 (quoting United States v. Vonn, 542 U.S. 55, 79 (2002)) (internal quotation marks omitted). The Court thus firmly rejected the contention that Rule 11 violations should be considered structural error, asserting that Rule 11 does not "demand[] automatic vacatur of the plea without regard to case-specific circumstances." Id. at 2148. Only "a very limited class of errors" should be considered structural errors such that they "trigger automatic reversal." Id. at 2149 (quoting United States v. Marcus, 560 U.S. 258, 263 (2010)) (internal quotations omitted). Rule 11, the Supreme Court stressed, "does not belong in that highly exceptional category." Id.

The majority notes that the Supreme Court did not adopt a difficult "but for" standard for determining whether the Rule 11(c) violation affected a defendant's rights, in this case the desire to proceed to trial. Maj. Op. at 16-17. It also bears noting that the court did adopt a "reasonable probability" standard, not a "reasonable possibility" test, which would have proven much easier for defendants to satisfy, but would also have undermined plea finality.

25

II.

I concur in the majority opinion because it rightly notes that the nature of the district court's involvement here lent itself to ready interpretation of a coerced plea agreement. The court handed out an assertedly more favorable sentence after a plea of guilty and threatened a "less pleasant sentence" if the defendant exercised his bedrock right to proceed to trial. J.A. 172. In addition the "close temporal proximity" between the court's comments and the reversal of field on the defendant's part resulting in a plea of guilty further augments the appearance of unwarranted judicial interference.

Crucial to my concurrence is the majority's recognition that other scenarios may be quite different from this case. Specifically judicial involvement may be more cursory than here. Or it may be that the plea agreement, unlike here, was entered prior to the trial court's alleged involvement. Or it may be again that a longer lapse of time attenuates any causal connection between a trial court's comments and a defendant's decision to plead guilty. Further, a Rule 11 plea hearing replete with safeguards to ensure the voluntary and intelligent nature of the plea may be a factor reinforcing the application of Rule 11's harmless error standard. See Davila, 133 S. Ct. at 2149-50. Finally, the prospect of defendants blowing hot and

26

cold as to their intentions to plead or go to trial would verge on sandbagging and not commend a challenge on appeal.

The factual scenarios are many and varied, and as the majority emphasizes, the case rises or falls on the "facts and circumstances" of the particular case. Maj. Op. at 15 (quoting Davila, 133 S. Ct. at 2149). This case is a close one, because the record hints at the kind of defendant gamesmanship that often masquerades as change of heart both on whether to proceed to trial or, in other cases, whether to exercise one's Faretta right to proceed pro se. See Faretta v. California, 422 U.S. 806 (1975). The majority has carefully explained why on the facts here, the defendant should be accorded the benefit of the doubt. The totality of the circumstances persuades me as well that the heavy arsenal of judicial authority was deployed to dissuade a defendant from exercising his fundamental right to a fair trial.